**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **MAGAN WALLACE** | § | **CIVIL ACTION NO.** 2:19-cv-00649 |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **PERFORMANCE CONTRACTORS,** | § | |
| **INC.** | § | |
| *Defendant* | § | |
| | § | **JURY DEMAND HEREIN** |

---

**PLAINTIFF'S ORIGINAL COMPLAINT**

---

**NOW COMES** Plaintiff, **MAGAN WALLACE,** through undersigned counsel, who files her Original Complaint against Defendant, **PERFORMANCE CONTRACTORS, INC.** She hereby states as follows:

---

**JURISDICTION AND VENUE**

---

1. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964 as it appears at 42 U.S.C. § 2000e *et seq.*

2. This Court has jurisdiction pursuant to the following statutes:

   a. 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, law or treaties of the United States;

   b. 28 U.S.C. § 1343 (3) and (4), which give district courts jurisdiction over actions to secure civil rights extended by the United States government;

3. It is a jurisdictional requirement of this Court that the Plaintiff has filed a charge with the Equal Employment Opportunity Commission (EEOC) prior to instituting action.  Plaintiff met this requirement by filing her EEOC charge on or about May 9, 2018 (Charge No. 460-2018-01425).

4. The EEOC mailed Plaintiff her Notice of Suit Rights on February 19, 2019. *See* Exhibit A. Plaintiff is afforded 90 days from her receipt of such Notice to commence suit, and the date of this filing is within the statutory period.

5. Venue is appropriate in this judicial district under 28 U.S.C. § 1391 (b) because the events that gave rise to this Complaint occurred in the Western District of Louisiana, specifically in Calcasieu Parish, making the Lake Charles Division the most appropriate Division for this suit.

## PARTIES

6. Plaintiff is a citizen of the United States and resides in the City of Silsbee, State of Texas.

7. Plaintiff is a female and, as such, is a member of a protected class.

8. At all times relevant to this suit, Plaintiff worked as a Level I Helper for Performance Contractors, Inc. at its "Sasol" facility located in Sulphur, Louisiana.

9. Defendant, **PERFORMANCE CONTRACTORS, INC. ("PERFORMANCE")**, is a municipal corporation organized and existing under the domestic laws of the State of Louisiana. Its principal place of business in located in the city of Baton Rouge, Louisiana.

## FACTUAL ALLEGATIONS

10.  On or about December 9, 2016, Plaintiff began her employment with Defendant as a Support Craft Firewatch at its "Sasol" project, located in Sulphur, Louisiana.

11. In approximately April 2017, Plaintiff's turnaround job ended, and she was laid off as a result thereof. She was quickly rehired by Defendant for another project as a Level I Helper at its Sasol site.

12. Plaintiff was informed by Defendant's Regional Manager, Matthew Goutreux, and by her Supervisor, Luke Terro, that they had been instructed not to bring female employees on to the new project.

13. Despite the instruction from Defendant to refrain hiring females for the project, Plaintiff was brought on, because Geautreau and Terro were confident in Plaintiff's work and wanted to help advance her skillset.

14. After a lunch safety meeting in July 2017, General Foreman, Charles Casey, asked all helpers to raise their hands. As instructed, Plaintiff raised her hand. In front of the entire group, Casey instructed Plaintiff to put her hand down because she did not count as a helper because she could not work elevated or put on a harness. When Plaintiff asked why she was being prohibited from working elevated and wearing a harness like other helpers, Casey stated, "because you're a girl. You have tits and an ass."

15. At no time whatsoever did Casey state that Plaintiff could not wear a harness because it would not fit over her body. Rather, he literally stated, "you have tits and ass" and refused to let her in the rack because she is a female, and females "stay on the ground."

16. Plaintiff was told on numerous occasions that she was not allowed to perform certain functions because she was a woman and because she "ha[s] tits and an ass." Numerous employees witnessed Plaintiff being told that she could not go in the rack because she's a woman.

17. On a daily basis, and oftentimes several times per day, Plaintiff was reminded that she was not allowed in the rack because she's a woman and that women have to stay on the ground.

18. On several occasions, Plaintiff was told by Defendant's agents and/or employees that she "did not count as a helper" because she is female.

19. Over several days, Charles Casey would instruct the men of their duties and end the conversation with, "Ok, all females are to stay on the ground, sweep, keep the unit clean, pick up trash, and keep the water coolers changed out."

20. Knowing that she was not receiving treatment and opportunities equal to that of her male co-workers, Plaintiff considered resigning almost immediately. Ultimately, Plaintiff refrained from doing so out of fear that she would not be able to secure another position in the field due to the fact that she was a woman.

21. Throughout June and July 2017, Plaintiff approached a supervisor, Luke Terro, and asked why she was not allowed to work elevated, as she wanted to do the job for which she was hired and learn. At that point, Terro assured Plaintiff that he had spoken to Casey and wanted her to work elevated. Despite this assertion, Plaintiff was continually precluded from working in the rack.

22. Plaintiff had experience in the rack from her previous employment. Another Foreman, Jason Brickford, informed Defendant that Plaintiff had previous experience working

elevated and could easily perform the tasks at hand. Despite this knowledge, Defendant steadfastly refused Plaintiff permission to work in the rack like her male co-workers.

23. On several occasions, the site was short-staffed due to issues on the Sasol site with management or absenteeism. Plaintiff offered to work elevated in order to help complete the assigned job tasks, but she was consistently turned down and reminded that she could not work elevated because "you're a female, you have tits and an ass, no."

24. Plaintiff spoke to Matthew Geautreau, the Project Area Manager, about wanting to work elevated. He stated that he would allow her to work elevated after the "dance floors were built." Plaintiff asked if they could meet in the middle, and if Performance did not want her climbing, to at least allow her to go on the dance floors – scaffold structures in the EOEG rack – and work on the scaffolds. She simply wanted to advance her utility at the job site and advance her skillset by working elevated alongside the more experienced employees.

25. Plaintiff reported her concerns that she was being subjected to different employment terms and conditions to her Supervisor, Luke Terro; however, her concerns were ignored and the discriminatory treatment was allowed to pervade.

26. On one occasion, Luke Terro asked Plaintiff if he could grab and squeeze her breasts, to which Plaintiff immediately replied "absolutely not."

27. At 3:37 p.m. June 3, 2017, Luke Terro sent Plaintiff a picture of his genitals while both employees were on-site. Luke Terro then asked Plaintiff for a picture of her breasts, which Plaintiff immediately refused to do.

28. At the time Plaintiff received the picture of Terro's genitals, another employee was standing right next to her. Plaintiff became visibly upset after she opened the photo. When

the employee asked what happened and Plaintiff explained what she had received, the employee immediately escorted Plaintiff to a break area to talk to Plaintiff and calm her down.

29. After Terro sent Plaintiff the explicit photographs, he approached Plaintiff and stated, "it took a lot of courage to send you those." Thereafter, Terro called Plaintiff "stingy" because she refused to send him any pictures in return.

30. Plaintiff immediately rejected any and all sexual advances by Luke Terro.

31. After Plaintiff consistently and repeatedly denied Luke Terro's sexual advances, he, in his capacity as supervisor, precluded Plaintiff from advancement opportunities and different functions of her position.

32. In June 2017, a welder, Charles Laprairie, Jr., asked Plaintiff her age. When Plaintiff revealed her age to Laprairie, he stated that Plaintiff did not look her age and, that, when he was that age, he was in his sexual prime and that Plaintiff should be, too. When Plaintiff ignored the comment and attempted to walk away, Laprairie followed her. As Plaintiff sat down on a toolbox, Charles walked up behind her and began sensually massaging her shoulders, neck, asking her if it felt "good." Plaintiff immediately got up, told him to stop, and informed her General Foreman, Justin Quebodeaux, of what happened.

33. Justin Quebodeaux, perturbed by the employee's contact with Plaintiff, immediately reported the incident to the General Foreman, Charles Casey. Mr. Wallace was advised that "they would take care of it" and assured that the welder would be given three (3) days' suspension and thereafter transferred to another area. Upon information and belief, the welder was not disciplined in any form or fashion, nor was he transferred away from Plaintiff.

34. After Justin Quebodeaux reported the incident to Matt Geautreau and Luke Terro, they immediately approached Plaintiff and assured her that they "would take care of it." They informed Plaintiff that they wanted to keep it "in house" and therefore would address the situation immediately; however, upon information and belief, no corrective action was taken.

35. Ultimately, Mr. Quebodeaux called the welder employee over in front of Plaintiff and spoke to him about the incident. Plaintiff was exceptionally embarrassed and uncomfortable as she was forced to witness the perpetrator scolded for her reports.

36. On one occasion, a Charles Casey stated to Plaintiff, "all I need is a bucket of blowjobs."

37. On almost a daily basis, Terro approached Plaintiff and would state something to the effect of, "let me touch them, let me squeeze them" while looking directly at her breasts.

38. In June 2017, Plaintiff sought the help of a physician to address the anxiety she had been experiencing due to her sexually hostile work environment. The physician ordered blood work and instructed Plaintiff that she would have to fast before the physician would issue the prescription. Plaintiff knew that she could not miss work again, and so Plaintiff held off on scheduling the next appoint for a rainout. The physician also recommended that Plaintiff begin seeing a therapist.

39. While Plaintiff had a higher job title, made more hourly, and had been with the company seven (7) to eight (8) months longer than a male employee, Trevor Jordan, she was not allowed to work in the rack. Trevor Jordan, a laborer, was permitted to work in the rack almost immediately upon hire.

40. Upon information and belief, Trevor Jordan missed several days of work and was never issued any reprimand of any kind.

41. Upon information and belief, at least two (2) male employees, Joey Treadway and Anthony Thomason, were hired on the project at the same time as Plaintiff. Both Mr. Treadway and Mr. Thumson were promoted; however, Plaintiff was overtly denied the opportunity to do so.

42. In late July 2017, A.C. Ferachi personally thanked Plaintiff for being a hard worker and for keeping his unit clean. He stated, "I like a woman who cleans."

43. On numerous occasions throughout Plaintiff's employment, A C Ferachi made it well known that he did not want females on the job site.

44. From August 7 through August 10, 2017, a particular project called for certain elevator work with an assigned fitter. The fitter assigned to work in the rack for that project went on vacation. As such, Plaintiff worked with Nick Fregia and used a scissor lift and elevated scaffold to clean trash off of the scaffold and watched Mr. Fregia measure, clean, and place coordinates. She then observed a welder, James Germany, III, weld pipe supports. When upper management observed Plaintiff in the rack helping perform a task well within her job description and capabilities, Plaintiff was instructed that management "better not see it again."

45. On August 13, 2017, both Plaintiff and Kris Tapley had originally taken the day off of work. Ultimately, both individuals arrived to work to help complete job duties and left early so that Performance was not without two (2) employees for an entire day.

46. On August 15, 2017, General Foreman, Justin Quebodeaux, asked Plaintiff what was wrong, because he could tell that she was upset. Plaintiff informed Mr. Quebodeaux that she was extremely frustrated and upset because, despite her best efforts, she was not being allowed to move forward in her career. She indicated that she had been brought to the site

to do a job, and that, while she tried each and every day, she was ultimately prevented from doing said job. She stated that she currently was confined to sweeping, refilling water, and taking out trash with other laborers, despite the fact that she had taken and passed the helper test, which should have entitled her to higher pay. In response, Mr. Quebodeaux stated, "I know. They are asking for it by not letting you do anything. I know you want to work and I have no problem with you working. I've worked with other women like you that are here to work. I support it. I'm gonna go to bat for you. I don't know what will happen."

47. After Plaintiff relayed her concerns to Mr. Quebodeaux, he informed Plaintiff that someone in upper management had seen her working in the rack for thee (3) days the week prior. Mr. Quebodeaux then stated that he was instructed that he "better not see her elevated again." When Plaintiff asked who these decisions and instructions were coming from, Mr. Quebodeaux relayed "upper management" and refused to identify the individuals by name.

48. On August 16, 2017, Plaintiff was written up and suspended for three (3) days due to "not calling in timely" after she had missed work for a physician's appointment. Upon information and belief, Plaintiff followed proper protocol and called in prior to the beginning of her scheduled shift.

49. During her August 16, 2017 appointment, Plaintiff was prescribed anxiety and depression medication to help her cope with the conditions prompted by her hostile work environment. Plaintiff broke down to tears on a daily basis in sadness, anger, and utter confusion as to why Performance would not let her do her job.

50. While Plaintiff and Kris Tapley were at the physician appointment, Kris Tapley began receiving text messages informing him that he was being terminated for missing the day and that Plaintiff was receiving a three-day suspension. Kris Tapley stated in response that

it was not company policy to issue either termination or suspension for this conduct. Mr. Tapley further indicated that the procedure is: 1) a verbal warning; 2) a written warning; 3) three-day suspension; and 4) termination. Neither Plaintiff or Kris Tapley had ever received a verbal or written warning of any kind.

51. Kris Tapley subsequently contacted the Performance Human Resources Department at its main office in Baton Rouge, Louisiana. After speaking with a representative named "Demp," Demp advised Kris Tapley that, while an employee may receive a verbal and/or written warning and suspension for missing work, termination for such an offense was improper as a matter of company policy.

52. After Kris Tapley informed Luke Terro that he had spoken to Human Resources about the discipline, Terro stated that he had "opened a can of worms."

53. On August 17, 2017, both Plaintiff and Kris Tapley returned to work. Mr. Tapley was taken immediately to process termination paperwork. Plaintiff was thereafter taken out to a unit to receive a write up and a three-day suspension. At that time, Plaintiff stated to Luke Terro that neither she nor Kris Tapley had ever been warned or reprimanded in any manner, and that, while she has no problems with company policy, she believes that the policy needs to be applied equally to all employees, which, in this instance, it was not.

54. On several occasions, other employees have missed one, if not multiple, days of work and received no reprimand whatsoever.

55. At that time, Luke Terro informed Plaintiff that he had issued Kris Tapley a purported write up back on July 15 and had just "kept it" and not told her. July 15th was a day that Plaintiff, Kris Tapley, and several other Performance employees had requested off for a "surprise" birthday party for Kris Tapley's 40th birthday. Luke Terro had been invited and had asked

Plaintiff several times to remind him so that he could attend as well. The date had been requested off and placed on the Performance calendar by Charles Casey for over a month.

56. At that point, Terro stated that he "didn't want to do this" but "it's out of [his] hands." Plaintiff informed Terro that she was unsure as to whether she would return to employment after her three-day suspension. Plaintiff then stated that, if she came back, she would have to be moved to a different area and put under different supervision. She stated that she would not come back to her particular unit. Terro stated that he understood.

57. Plaintiff attempted to contact the Performance Human Resources Department on several occasions and even traveled to the office in search of help; however, after attempting communication and receiving no response after several daily attempts, Plaintiff stopped attempting to communicate with Defendant under the belief that any attempt to do so was futile.

58. Ultimately, due to the entirely unaddressed hostile work environment and clear retaliatory activity, Plaintiff had no choice but to resign from her employment on or about August 23, 2017.

59. At no time whatsoever has Plaintiff received any purported "termination paperwork" from Performance.

## FIRST CAUSE OF ACTION:
## SEXUAL DISCRIMINATION IN EMPLOYMENT
*Pursuant to 42 U.S.C. 2000e et seq.*

60. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

61. Plaintiff is a female and is therefore a member of a protected class.

62. On a daily basis, and oftentimes several times daily, Plaintiff was overtly prohibited from working elevated because she is a woman and because "she has tits and an ass." Despite the fact that Plaintiff had worked in the rack with her previous employers, she was precluded from working in the rack because "women stay on the ground."

63. Other male helpers, and even male laborers, were permitted to work in the rack without any question or pushback whatsoever.

64. Plaintiff's sex, female, was a determining factor in treating Plaintiff less favorably than male employees.

65. Upon good information and belief, based on disparate treatment, Plaintiff alleges that she was subjected to unlawful discrimination on the basis of her sex.

66. Plaintiff opposed what she perceived to be discriminatory treatment on the basis of her sex, female. Performance did absolutely nothing to rectify the situation.

67. Wherefore Plaintiff asks this Honorable Court to find **PERFORMANCE CONTRACTORS, INC.** liable for the violation of Title VII of the Civil Rights Act of 1964.

---

## SECOND CAUSE OF ACTION:
## SEXUAL HARASSMENT/DISCRIMINATION IN EMPLOYMENT
*Pursuant to 42 U.S.C. 2000e et seq.*

---

68. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

69. Plaintiff is a female and is therefore a member of a protected class.

70. The harassment to which Plaintiff was subjected was based entirely on her sex.

71. On several occasions, she was asked by male employees if they could "grab" or "squeeze" her breasts. Upon information and belief, male employees were not asked these sorts of questions.

72. On numerous occasions, Luke Terro, the Superintendent and Plaintiff's supervisor, asked Plaintiff if he could touch her breasts, and he even asked her to send him pictures of them. When she refused to do so, he called her "stingy." Upon information and belief, Terro did not ask male employees for explicit pictures of themselves.

73. When Plaintiff refused to send Terro explicit pictures of her body, he sent her a photograph of his genitals while both employees were on-site. Afterwards, he informed Plaintiff that it took real courage to send her the picture. Upon information and belief, Terro did not send explicit photos of his genitals to male employees.

74. Charles Laprairie, Jr. asked Plaintiff about her sexual prowess or followed her and thereafter caressed her shoulders in neck in a sexual manner and in the presence of other employees. Upon information and belief, Laprairie did not engage in similar conduct with male employees.

75. Both Terro's and Laprairie's conduct was entirely and expressly unwanted by Plaintiff. Plaintiff consistently told both Terro and Laprairie that she did not want to be the subject of their respective behavior and/or comments.

76. Terro's and Laprairies' collective, deliberate and consistent touching of and comments directed at Plaintiff were so severe and/or pervasive that they singlehandedly altered a term and/or condition of Plaintiff's employment.

77. The sexual harassment to which Plaintiff was continuously subjected was so objectively unreasonable that any reasonable person in Plaintiff's situation would have been forced to resign or otherwise constructively discharged from employment.

78. Defendant knew or should have known of the harassment. Plaintiff informed Luke Terro and Jason Geautreau that Terro's and Laprairie's behavior was entirely inappropriate and unwanted. Despite her complaints, Defendant did not take any corrective action whatsoever.

79. Defendant failed to properly investigate and remedy the situation. Instead, Defendant allowed the sexually hostile work environment to persist until Plaintiff had to ultimately resign. Plaintiff even informed Luke Terro that she likely would not return to work after her three-day suspension in August 2017; however, if she did return, the return would be entirely contingent on her being moved out from his supervision. Ultimately, Plaintiff did not return to work and was constructively discharged on approximately August 23, 2017.

80. As a result of the sexually hostile work environment and Defendant's overt failure to remedy the situation, Plaintiff sought medical attention to address the anxiety and depression that stemmed entirely from such an environment. Plaintiff suffered embarrassment, extreme discomfort, and emotional distress as a direct result of being subjected to such pervasive sexual harassment in the workplace.

81. Wherefore, Plaintiff asks this Honorable Court to find **PERFORMANCE CONTRACTORS, INC.** liable for the violation of Title VII of the Civil Rights Act of 1964.

## THIRD CAUSE OF ACTION:
## HOSTILE WORK ENVIRONMENT

82. Plaintiff incorporates and reinstates each of the above paragraphs as if fully set forth herein.

83. The constant discriminatory remarks made to Plaintiff regarding her sex, the overt denial of equal job opportunities to that of male helpers, caused Plaintiff substantial embarrassment, grief, anxiety and mental anguish.

84. The harassment was so severe or so pervasive that it altered the conditions of Plaintiff's employment and created an abusive atmosphere. The continued harassment prompted Plaintiff to ultimately resign from her employment with Defendant.

85. Although Defendant was made aware of the hostile work environment promulgated by Charles Casey and several other employees, Defendant took no remedial action to stop the hostile environment and to prevent this type of unlawful activity from occurring.

86. Defendant, through its agents and officers, knowingly, and intentionally allowed the hostile work environment to exist.

87. Defendant, by its overt act or failure to act herein, supported the ongoing hostile work environment.

88. As a direct result of Defendant's failure to address or otherwise remedy Plaintiff's complaints of harassment and discrimination, Plaintiff had no choice but to resign from her employment.

89. As a result of the stressful environment, Plaintiff began suffering anxiety and depression. She has sought medical attention to address these health concerns.

90. Wherefore Plaintiff asks this Honorable Court to find **PERFORMANCE CONTRACTORS, INC.** liable for creation of a hostile work environment based on Plaintiff's sex in violation of Title VII of the Civil Rights Act of 1964.

---

**FOURTH CAUSE OF ACTION:**
**RETALIATION**
*Pursuant to 42 U.S.C. § 2000e-3(a)*

---

91. Plaintiff incorporates and reinstates each of the above paragraphs as if fully set forth herein.

92. Title VII makes it an unlawful employment practice for a person covered by the Act to discriminate against an individual "because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or hearing under this subchapter. 42 U.S.C. § 2000e-3(a).

93. Plaintiff advised Defendant, through Luke Terro and Jason Geautreau, of what she reasonably believed to constitute illegal discriminatory activity exhibited agents and/or employees on various occasions. Rather than disciplining individuals who acted in a discriminatory manner, Defendant issued Plaintiff a written reprimand and three-day suspension for an act that several Performance employees engaged in and received no reprimand for whatsoever.

94. Plaintiff's consistent opposition to what she perceived to be workplace discrimination on the basis of sex and sexual harassment, constitutes protected activity pursuant to Title VII.

95. Ultimately, after Plaintiff complained of the sexual discrimination and harassment to upper management, she was subjected to excessive discipline in an overt attempt to pad her record and slate her for unwarranted termination.

96. Ultimately, Defendant's overt and continued failure to address or even acknowledge her complaints of sexual discrimination and harassment caused Plaintiff considerable anxiety and depression, which became exacerbated to such an extreme extent that she was forced to resign on or about August 23, 2017. As such, Plaintiff was constructively discharged from her employment.

97. As set forth above, Defendant, through its agents, supervisors and/or employees, in a continuing course of conduct, subjected Plaintiff to retaliation and discrimination in the terms, conditions, and privileges of her employment in retaliation for her opposing what she believed to be unlawful conduct on various occasions.

98. Defendant failed to act in accordance with 42 U.S.C. § 2000e-3(a).

99. Defendant's retaliation is willful, intentional, and committed with malice or reckless indifference to the protected rights of Plaintiff.

100.    As a result of Defendant's discriminatory conduct, Plaintiff has suffered non-pecuniary losses including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses to be more fully developed at the trial on this matter.

101.    Wherefore Plaintiff asks this Honorable Court to find Defendant, **PERFORMANCE CONTRACTORS, INC.** liable for the violation of 42 U.S.C. § 2000e-3(a).

---

## PRAYER

---

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendant providing the following relief:

(a) All damages to which Plaintiff may be entitled, including but not limited to back pay, reimbursement for lost position and training, social security and other benefits, front pay, and any and all statutory relief;

(b) Reasonable attorney's fees, with conditional awards in the event of appeal;

(c) Pre-judgment interest at the highest rate permitted by law;

(d) Post-judgment interest from the judgment until paid at the highest rate permitted by law;

(e) Costs, including expert fees;

(f) Reasonable and necessary medical care and expenses in the past and future;

(g) Mental anguish damages in the past and future;

(h) Injunctive relief; and

(i) Such other and further relief, at law or in equity, to which Plaintiff may be entitled.

---

## DEMAND FOR JURY TRIAL

---

Pursuant to Rule 38 of Federal Rules of Civil Procedure, the Plaintiff demands trial by jury in this action of all issues so triable.

**Respectfully Submitted**,

**SUDDUTH & ASSOCIATES, LLC**
Attorneys-at-Law
1109 Pithon St.
Lake Charles, Louisiana 70601
(337) 480 - 0101 (*Telephone*)
(337) 419 - 0507 (*Facsimile*)

**BY:** /s/ James E. Sudduth, III
       **JAMES E. SUDDUTH, III, #35340**
       **KOURTNEY L. KECH, #37745**
       **ERIN N. ABRAMS, #38119**
       *Counsel for Plaintiff*